ENRIQUE OLIVENCIA, Plaintiff and Appellant, v. TOMÁS PÉREZ SALES, Defendant and Appellee.

No. 6866. Argued February 6, 1936.—Decided May 20, 1936.

*Bolívar Pagán* for appellant. *José Sabater* for appellee.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the court.

Enrique Olivencia by the action herein sought to be declared the acknowledged natural child of Pedro Pérez Sales, a brother of the defendant, with all the rights appertaining to such status.

It was alleged in the complaint that the plaintiff was the natural child of Filomena Olivencia and was born out of

wedlock as the result of a love affair between the latter and Sales, who died in Mayagüez on July 6, 1932; that at the time of plaintiff's conception, both Filomena Olivencia and Pedro Pérez Sales were of legal age and single, and there existed no legal impediment whatsoever to prevent them from contracting marriage with each other; that Enrique Olivencia has since his birth been in the uninterrupted possession of the status of a natural child of Pedro Pérez Sales, who always treated and considered the plaintiff, in public and in private, as his child, bestowing upon him parental affection, keeping him under his custody and care, and paying for his board, clothing, food, medicines, and education; that Pedro Pérez Sales died without leaving any ascendants or descendants, and that his brother, the defendant Tomás Pérez Sales, is the only relative he left at the time of his death.

The defendant denied the essential allegations of the complaint, and set up that Filomena Olivencia, mother of the plaintiff, married Pedro Leandro Marrero on August 30, 1893, and that as it appears from the Civil Register of Mayagüez, Enrique Olivencia was born on November 10, 1897, at which time Filomena Olivencia was married to the said Pedro Leandro Marrero.

Prior to the time of the filing of the complaint herein, Enrique Olivencia had instituted, in the District Court of San Juan, a proceeding *in perpetuam rei memoriam* alleging that the date of his birth was November 10, 1891, and not November 10, 1897, and prayed that the court order the corresponding correction to be made in the Civil Register of Mayagüez. The district court decided said proceeding by granting the relief sought by the petitioner.

The District Court of Mayagüez, after considering the evidence introduced at the trial which was held, rendered judgment for the defendant on the following grounds:

"When the evidence regarding the correction of the date of the plaintiff's birth was presented, the defendant objected to its admission. In our Code of Civil Procedure there is no provision concern-

ing proceedings to perpetuate testimony, but the Spanish Code of Civil Procedure which was formerly in force in this island prescribed in section 2001 and succeeding sections, the procedure to be followed in said proceedings. In the proceeding *in perpetuam rei memoriam* herein the prosecuting attorney did not intervene nor was the defendant notified of it. If the Spanish Code of Civil Procedure is not applicable in this case the circumstances under which this *ex parte* proceeding was prosecuted shows that it was evidence prepared for this suit, and, therefore, has no probative value whatsoever and should be rejected.

"In these circumstances, the plaintiff was born while his mother Filomena Olivencia was legally married to Pedro Leandro Marrero, whom she never divorced and of whom plaintiff is a legitimate child, and therefore he can not be adjudged to be an acknowledged natural child of the predecessor in interest of the defendant."

We agree that proceedings *in perpetuam rei memoriam* have no probative value where they are not prosecuted with the formalities required by law. If these requirements are complied with, such proceedings serve to establish the facts to which they refer, unless proof to the contrary is shown and unless they relate to facts which may prejudice some certain and determinate person.

In commenting on the probative force or value of those proceedings, Manresa says:

"Although the law does not provide it here, it has already provided it in section 596, which says that 'under the name of formal public documents are included . . . all kinds of judicial proceedings.' The proceedings we are discussing are judicial acts, and therefore, in a trial they would have the same probative force as formal public documents to prove the facts to which they refer, except, of course, where evidence to the contrary is shown. But, in order to have such probative force they must have been prosecuted with the formalities required by section 2003 and succeeding sections, and as ordered by section 2002, should not relate to facts which may prejudice some determinate and certain persons. If they lack these requisites, they can have no probative force, as was held by the Supreme Court of Justice in its judgment rendered on June 27, 1864." (Manresa, *Ley de Enjuiciamiento Civil*, (3d ed.) vol. 6, p. 443.)

Had this been the only evidence presented, there is no doubt that we would be bound to affirm the judgment of the lower court dismissing the complaint on the merits. But the plaintiff further offered testimonial evidence to show that at the time of his birth his mother, Filomena Olivencia, was unmarried; that he is the son of Pedro Pérez Sales; and that he was in possession of the status of a natural child of the latter.

On December 19, 1910, several years after the birth of Enrique and twenty years before this action was commenced, Filomena Olivencia registered in the Civil Register of Mayagüez the birth of her son Enrique. From the certificate issued by the secretary of the Civil Register we transcribe the following:

"In the city of Mayagüez, at ten o'clock in the morning of the nineteenth day of December, one thousand nine hundred and ten, Filomena Olivencia, of Mayagüez, of legal age, single, a seamstress by profession,_____ street, and domiciled in the ward of Mayagüez Arriba, appeared before Mr. Rafael Mangual Delgado, Municipal Secretary, and declared the birth of a child born in the house of the declarant on the tenth day of November 1897, at twelve o'clock midnight, and that he is the natural child of the declarant. He is the grandchild on his mother's side of Cristina Olivencia. And that this child is named Enrique."

As may be seen, the mother of the plaintiff appears to have declared that she was single on the date that the registration was made. By that time the said lady was married to Pedro Leandro Marrero. It is strange that Filomena Olivencia should declare that she was single on the day that she registered the birth of her child, rather than on the date of his birth, in order to be able to register him a natural child. What interest could that lady have in stating an untruth? Can one imagine that she would register as a natural child a legitimate one? Why, if he was legitimate, did not her husband register him seasonably? It may be that Filomena Olivencia was mistaken as to the date of the

birth of her child at the time she made the registration, and it is also possible that she was misunderstood by the person in charge of the Civil Register. In her testimony, when questioned by the attorney for the defendant, the mother of the plaintiff stated that she was married when she registered her child but that she was single when she had him. From the transcript of the evidence we copy the following:

"Q. Did you go to register your child Enrique?
A. Yes, sir.
Q. Where did you register him?
A. In the Civil Register of Mayagüez.
Q. When you registered him, did you say you were single?
A. No, when I registered him I was married, but I had the child when I was single.
Q. When did you get married?
A. In the year 1893.
Q. Were you married by the Catholic Church?
A. Yes, sir.
Q. Were you ever divorced?
A. Never, until the death of Pedro Leandro Marrero.
Q. Do you know when he died?
A. About two years ago, but I don't know the date."

According to the register, Filomena further declared that her son was born on November 10, 1897. This registration, as we have already stated, was made twenty years before this suit was filed, so long ago that it is not possible that the mother of the plaintiff should have been getting ready to bring an action of filiation against Pedro Pérez Sales. An intention to prepare for bringing a future suit against an unnamed father who is not affected by the act of the mother in registering and acknowledging her natural child, can not be inferred from the fact that she complied, even though belatedly, with the duty to record the birth of her natural son.

Filomena Olivencia testified that Pedro Pérez Sales was her first husband; that they knew each other since childhood and that both lived near each other in the ward of

Bateyes; that Pedro Pérez Sales courted her for about a year and that she had a son named Enrique Olivencia; that she lived with Pérez in her house with the consent of her mother; that they lived as husband and wife and that he went to her house every week to bring her money; that he came at night and that the child went to his home daily; that she remembers that during the year of courting Pedro Pérez Sales gave her a ring, on which the name and surname of Pedro and the year were engraved; that about a year after the birth of the child, Pedro Pérez Sales took him to his grandmother's house and told her that he was going to keep him because the grandmother loved him dearly; that two years afterward the witness married Pedro Marrero, of whom she had two sons; that all the expenses of her son Enrique Olivencia were paid by his father, Pedro Pérez Sales, who took care of the maintenance and support of Enrique; that Pedro Pérez Sales gave her the clothing and food for the child and that he provided everything; that she thought she had lived with Pedro Marrero about ten years; that she thought so, although she could not remember dates; that during the time she was married to Pedro Marrero, Pedro Pérez Sales paid the expenses of Enrique Olivencia; that she registered Enrique in the Civil Register of Mayagüez; that she registered him while she was married; that she had him when she was single; that she was married in 1893.

The witness Francisca Laguerra testified that she acted as midwife at plaintiff's birth; that Pedro Pérez Sales· called for her in order that she should assist Filomena Olivencia at Enrique's birth; that she rendered that service; that she was present up to the time of the birth of Enrique Olivencia; that Pedro Pérez Sales paid her for said service; that Pedro Pérez Sales always awaited at the house for the arrival of the witness in order to take care of the child; that she assisted Filomena Olivencia during the corresponding nine days; that she was about twenty-five years old on that

date; that Filomena Olivencia lived with her mother and that at that time she was young and a virgin; that she was married about two years after she had the child; that the witness could not remember the name of the person whom she married; that about one year after the birth of the child she left for Las Marías and on that account she did not know whether the husband of Filomena was dead or alive; that about eight years after she had left for Las Marías she saw again Enrique Olivencia.

Luis Vázquez Brugman, seventy-seven years old, testified that he lived with Pedro Pérez Sales for about twenty or twenty-five years in a small house next to his residence; that Enrique Olivencia was about ten or twelve years old at the time of the American invasion and the San Ciriaco cyclone, and that Pedro Marrero married Filomena Olivencia after Enrique's birth.

Several witnesses testified for the plaintiff to prove the allegations of the complaint, but the only ones who definitely asserted that when Enrique Olivencia was born his mother was unmarried were the ones we have just mentioned. Several witnesses for the defendant also testified on this point.

Gregoria Marrero, a sister of Pedro Marrero, stated that she lived at Bateyés under the care of the defendant, Tomás Pérez Sales; that she knew that Enrique Olivencia was born in the ward of Bateyes, at his grandmother's house, and that at the time of the birth Filomena was already married tó Pedro Marrero. Concerning the testimony of this witness, we copy the following from the transcript of the evidence:

"Q. Did you know Pedro Marrero?
A. Of course I did!
Q. Why do you know him?
A. Because he was my brother.
Q. Is Pedro Marrero dead or alive?
A. Dead.

Q. When did he die?

A. I can't remember the date; I think that it was about two years ago.

Q. When Pedro Marrero died, was he single, married, or a widower?

A. Married.

Q. Who was he married to?

A. To Filomena Olivencia.

Q. Do you know Enrique Olivencia?

A. Of course I know him.

Q. What relation is Enrique Olivencia to you?

A. We may have a slight blood relationship on account of his mother, none on account of his father."

Note how Gregoria Marrero, after being asked what relationship she had with Enrique Olivencia, answered that there might be some blood relationship on account of his mother, none on account of his father. That is to say, the witness was no relation to the plaintiff through her brother Pedro Marrero. She might have a slight blood relationship with Filomena Olivencia. This answer, an innocent outburst by a person who lives under the care of the defendant, and who is a sister of Pedro Marrero, seems to point out where the truth lies.

The witness Gregorio Olivencia testified that when Enrique was born, Filomena was married to Pedro Marrero. This witness was subjected to a thorough cross-examination by the plaintiff in order to show his interest. His testimony does not convey the impression that he was telling the truth.

Pedro Desjardín also testified that Filomena Olivencia was married to Pedro Marrero when the plaintiff was born. This witness lives in the home of Tomás Pérez.

This is all the evidence introduced by the defendant to prove that Filomena Olivencia and Pedro Marrero were married at the time of plaintiff's birth. Against this testimony we have the declaration of the mother who related in detail her relations with Pedro Pérez Sales, the conception of the child, and his birth previous to her marriage to Pedro

Marrero. The midwife, who claimed to be about ninety years old, testified clearly and lucidly, without any apparent contradictions and without hesitating upon being cross-examined by the defendant. The testimony of this witness is clear and definite. Pedro Pérez Sales went to fetch her in order that she might assist Filomena Olivencia at the time of the birth of the plaintiff; Pedro Pérez was then present and paid for the services rendered by the witness; Pedro Pérez always waited at the house for the midwife to arrive and assist the child.

Concerning the enjoyment of the status of a natural child, besides the testimony of Filomena Olivencia and Francisco Laguerra, that we have already reviewed, other evidence was introduced which we will state presently.

Juan Arroyo Mestre testified that he was sixty-five years of age and a resident of Mayagüez, and that he has lived there from the time of his birth; that he knew Pedro Pérez Sales since 1908; that Pedro Pérez Sales had great confidence in him and that he helped him prepare certain documents to secure a loan from the Federal Land Bank; that he was the adviser of Pedro Pérez Sales; that he used to go to Pedro Pérez Sales' home and that he met Enrique Olivencia there; that they called him there Enrique Pérez; that he met Enrique Olivencia while living at his father's home and coming in a buggy of his to Mayagüez; that the father gave him money for food and entertainment, and called him his son; that Enrique Olivencia called Pedro Pérez Sales his "father"; and that Pedro Pérez Sales referred to him as his son; that he saw Pedro Pérez Sales every week; that he went to his property often; that he observed that harmony existed between Pedro Pérez Sales and Enrique Olivencia; that he gave him clothing, food, and everything; that he treated him as a son; that Pedro Pérez Sales brought Enrique Olivencia to the witness' home and he was given food; that Pedro Pérez Sales gave him money for the child; that the relations were cordial; that everybody knew that

Enrique Olivencia was the son of Pedro Pérez Sales in the entire ward; that he talked several times to Pedro Pérez Sales concerning the acknowledgment of Enrique Olivencia; that he asked him how to go about acknowledging the child and he told him that by means of a will; that he referred to Enrique Olivencia; that he has known no other person by that name; that he did not know the mother by name, merely by sight; that he knew that the mother was married, but that he did not know the husband; that the will to which the witness referred was never executed.

Lope Valdespino testified that he was about 45 or 46 years old; that he had lived in Mayagüez all his life; that he knew Enrique Olivencia; that he had known him from childhood; that he knew Pedro Pérez Sales as far back as he can remember; that he lived at the ward of Bateyes, as did the witness; that they were always friends, used to go to parties; that the witness visited the house of Pedro Pérez Sales and the latter that of the witness; that the parents of the witness were friends of Pedro Pérez Sales; that he was about four or five years older than Enrique Olivencia; that he saw him for the first time when he was very young, about four or six years old, living with his mother, that thereafter he lived with his father, with Pedro Pérez Sales; that he saw Enrique Olivencia and Pedro Pérez Sales very frequently; that Pedro Pérez Sales treated Enrique Olivencia as his son; that Enrique Olivencia called him "father"; that Pedro Pérez Sales was always with Enrique Olivencia; that he saw that the child obeyed the father; that he treated him as a father treats a child; that he knew that Enrique Olivencia was the nephew of Tomás Pérez Sales, who has never denied it and has admitted that Enrique Olivencia is his nephew; that he met Enrique Olivencia when he was four years old because he lived across the street from him with his grandmother, "during the war, then with the uncle, with Tomás, in my own house"; that Enrique Olivencia was in the United States at the time of the death of Pedro Pérez

Sales; that he knew Enrique Olivencia's mother very well; that she is now the widow of Pedro Marrero; that Pedro Marrero died but a short while ago; that he could not remember when was Enrique Olivencia born; that he became acquainted with him at the age of eight or nine years; that he knew three children of Filomena Olivencia; that the other two are younger than Enrique Olivencia.

Luis Ramírez testified that he was sixty years old; that he knew Pedro Pérez Sales in the ward of Bateyes for about five or six years; that at that time he met Enrique Olivencia, and that he must have been three or four years old; that he knew Filomena Olivencia, who is the mother of Enrique Olivencia; that he went often with Pedro Pérez Sales to the house of Enrique Olivencia's mother; that Pedro Pérez Sales called him his son and took him here and there and treated him as his child; that he lived in that ward about four or five years; that Enrique Olivencia lived with his mother at that time; that about every fortnight he met Pedro Pérez Sales with the child; that he spoke with him and asked him: "What about that little boy?" and Pedro Pérez Sales told him: "He is my son"; that Pedro Pérez Sales lived in the house with Filomena Olivencia.

Carmen López testified that she is a resident of Mayagüez and that she has lived there all her life; that she met Pedro Pérez Sales on or about 1909 or 1910; that she had a love affair with him and that he took her to his house; that she lived with him as his wife, as his mistress; that she lived with him about three years; that she always saw him because they lived in the same house; that she lived with him for about a year and then he purchased her a house in the ward of Colombia, and that he used to go there; that she knew Enrique Olivencia; that when Pedro Pérez Sales took her to the property Enrique Pérez was there, that everybody knew him as Enrique Pérez; that Pedro Pérez Sales treated Enrique Olivencia as his son; and that Enrique Olivencia

treated him as a father, very considerately; that she observed this during all the time that she lived there.

Ramón Rodríguez testified that he was almost sixty years old; that he was raised in the home of Pedro Pérez Sales, in the ward of Bateyes, Mayagüez; that he lived in said house ever since he was a child; that he lived there as a relative of Pérez; that he met Enrique Olivencia as a child in the house of Pedro Pérez Sales; that ever since he was a child, Enrique Olivencia had lived with Pedro Pérez Sales; that Pedro Pérez Sales and Enrique Olivencia treated each other as father and son; that Enrique Olivencia called Pedro Pérez Sales his father and the latter answered as a father; that he observed this until he left the house and came to Mayagüez about 10 or 12 years ago; that Pedro Pérez Sales told him that Enrique Olivencia was his son; that he knew Enrique Olivencia's mother since he was very young; that Enrique Olivencia was living with Pedro Pérez Sales at the time of the American invasion.

Luis Vázquez Brugman testified that he was 77 years of age; that he knew Pedro Pérez Sales and lived close to him for 20 or 22 years, in a small house next to his home; that he worked for Pedro Pérez Sales at a sawmill; that he knew Enrique Olivencia, otherwise called Enrique Pérez, as he lived in the house; that Pedro Pérez Sales treated Enrique Olivencia as his son; that Pedro Pérez Sales warned Enrique Olivencia to be very careful with the other children at the school; that Pedro Pérez Sales treated Enrique Olivencia as a father treats his son; that later, when the child learned something, many times don Pedrito was sick and could not go to take note of the coffee gathered and he would send the boy to do it; that Pedro Marrero married Filomena after Enrique's birth; that she was married in 1890 or 1891; that he did not know whether Filomena had other children.

Enrique Olivencia testified that he was about 41 or 42 years of age; that Pedro Pérez Sales was his father; that he remembered his father as far back as his memory could

reach; that ever since he could remember, he lived with his father and his grandmother in the ward of Bateyes, Mayagüez; that Pedro Pérez Sales considered him as his son; that when he addressed him he called him "father"; that he paid for his clothing, shoes, food, and medicines; that he sent him to the "Naranjales" school; that Pedro Pérez Sales took him to Mayagüez in his coach; that he treated him as his son and took the witness everywhere; that he lived with Pedro Pérez Sales up to 1914; that one day he was without work and telephoned him and told him he was broke and asked him for $75 for a ticket to New York, and that his father gave him the money; that he wrote him two letters while in the United States; that he was in the United States about eleven years; that he returned from the United States about one month after the death of his father; that he learned he had died at the house of Tomás Pérez Sales; that the latter treated him as a nephew; that the witness went to his house and Tomás Pérez Sales turned him out and gave him $10; that during the time he lived with Pedro Pérez Sales no other person paid for his food, clothing, etc.; that he could not say whether his father answered his letters while the witness was residing in the United States.

Gregorio Olivencia testified for the defendant to the effect that months went by without his seeing Pedro Pérez Sales and that he never saw Enrique Olivencia with Pedro Pérez Sales.

Gregoria Marrero, a sister of Pedro Marrero, testified, as we have already stated, that she might have a slight blood relationship with Enrique Olivencia on the mother's side, but none on the father's side.

Pedro Desjardín testified that Enrique Olivencia lived with Filomena Olivencia until he left for the United States; that he never lived with Pedro Pérez Sales.

The defendant also introduced in evidence the following documents: a birth certificate of Enrique Olivencia, which we have already examined and discussed, a decision of the

District Court of Mayagüez rendered in a proceeding to incorporate in a deed a certain oral will executed by Pedro Pérez Sales where it is stated that he died without legitimate or illegitimate ascendants or descendants, and two complaints filed by the People of Puerto Rico against the plaintiff, one for disturbing the peace and another for aggravated assault and battery, together with the corresponding judgments of conviction.

In the first complaint, filed November 11, 1915, it is alleged that Enrique Marrero disturbed the peace and tranquility of Pedro Pérez, by throwing stones at the balcony of Pérez's house with the criminal intent to frighten and disturb him. The defendant stated that his name was Enrique Pérez and the substitution of the name was ordered, and judgment was rendered against Enrique Pérez. The second complaint was filed on November 18, 1915, against Enrique Marrero, known as Enrique Pérez, for having battered Ramona Vargas with a stone. The defendant urges that the first complaint was filed against Enrique Marrero, who then alleged that his name was Enrique Pérez, for disturbing the peace of Pedro Pérez, from whom he claims his paternity. Even though this Pedro Pérez mentioned in the complaint be the father of the plaintiff, and even though the conduct of the son should be reproachable, it is significant that at that time, many years before the present was instituted, the plaintiff should allege that his name was Enrique Pérez. The second complaint was also filed against Enrique Marrero, known as Enrique Pérez. It is thus seen that the very evidence introduced by the defendant shows that Enrique Marrero was known as Enrique Pérez, corroborating in this respect the evidence of the plaintiff.

We have carefully examined the evidence introduced. In our opinion it has been satisfactorily shown that the plaintiff is the son of Pedro Pérez Sales and that he was in possession of the status of a natural child. The strong evidence intro-

duced in support of the filiation claimed was not overcome by that adduced by the defendant, part of which, as we have stated, it may be asserted tends to corroborate plaintiff's evidence. This is established by the testimony of Gregoria Marrero, and also by the records of the two criminal proceedings, where it is stated that the plaintiff was known by the name of Enrique Pérez. The defendant himself, Tomás Pérez Sales, a brother of Pedro Pérez Sales, who was present during the trial, did not testify even though he was directly referred to by witness Lope Valdespino, and by the plaintiff Enrique Olivencia. As we have seen, the former testified that he knew that Enrique Olivencia was the nephew of Tomás Pérez Sales; that the latter had never denied it, and that he had admitted that Enrique Olivencia was his nephew. When questioned by the defendant he answered that he met Enrique Olivencia when he was four years old because he lived across the street with his grandmother, "during the war; then with his uncle, with Tomás, in his own house," in the very house of the witness.

The plaintiff stated that he learned of the death of his father in the house of Tomás Pérez Sales, who treated him as a nephew; that the declarant went to the house of the defendant and the latter gave him $10.

We consider all the allegations of the complaint to have been proved and, therefore, we are of the opinion that the judgment appealed from should be reversed and another rendered instead decreeing plaintiff Enrique Olivencia to be the acknowledged natural son of Pedro Pérez Sales, with all the rights appertaining to such status, without special imposition of costs.

Mr. Justice Wolf dissented.

Mr. Justice Travieso took no part in the decision of this case.